The oral argument is in the matter of the Estate of Coley. Your Honors. Counsel. We're here on the Estate of Coley. I represent Shirley Coley. My name is Pat Ducey. Shirley Coley is the mother of the decedent. The other party is Barb Coley, who was the wife of the decedent, married the decedent five years before his death. We come up on an order entered by the court following a non-jury hearing on a citation to recover assets filed by the administrator. The administrator has not filed a brief in this case. In the citation to discover assets, the administrator sought to recover structured settlement payments that the decedent had mailed to his mother. There were two structured settlement payments that Shirley had that she was in possession of at the time of the decedent's death. And other structured settlement payments that were delivered to her after the decedent's death. At the hearing, the administrator's position was, if they're not named in Shirley Coley's name, then they don't belong to her. As a matter of law, he was saying they don't belong to her because they were named in the decedent's name. Shirley Coley introduced evidence by way of affidavit, testimony, and other corroborating evidence to establish that these checks were a gift. He established the fact that 18 years prior to his death, or we should go back to the time of the structured settlement, the circumstances surrounding the structured settlement was the wrongful death of Mary Trimble Coley, the decedent's wife, and his unborn child. The decedent regretted the emotional trauma that was caused by the parents, and he was really distraught that the parents could not bring the case on their own. He thought they should have some compensation for what they went through. He settled first with the doctor on the underlying suit, and this is back in about 1992. He settled with the doctor, and immediately within a week or so, he had his will drawn up to make sure that it showed that the in-laws, as well as his parents, shared equally in that structured settlement, so he died as compensation for the wrongful death. Two years later, the settlement was entered into with the HMO. The settlement offer was such that he would be able to compensate both sets of parents and still be able to get a structured settlement for himself, so he instructed the attorneys to negotiate a structured settlement for the Trimbles, his in-laws, which they, on a comparable basis, to the doctor's settlement, which he intended to give to Shirley Coley. So that was done, that was negotiated, and it was complete. Seven years after that, around 1999, he went to his mother and he says, quit working, I'm going to give you these structured settlements from the doctor's settlement, which is sometimes in the record referred to as Chetri's settlement. And he asked her to quit working, which she did once he started delivering the checks to her. Now, the structured settlement documents, of course, have an anti-assignment provision, and the structured settlement contract says that you have to designate in writing where you want these checks sent. So, originally the checks were being sent to him. In 1999, he directed that they be sent to his mother. For 18 years, his mother was receiving those and living off of those. Then- I want to interrupt you a little bit about a factual issue I'm a little unclear about. It didn't seem like it's as straightforward as that in the sense that after she received the checks, it would go back to him and then be deposited. He would write her a check? Not always for the full amount? Well, here's what happened, Your Honor. She'd get the checks delivered to her, and then she'd work out an arrangement on how to cash the checks. And the arrangement was with him. Sometimes it went down to him, sometimes it came up there, and at the time, he endorsed it, put it in his account, and he'd write her a check back. So they always went back into his account? Well, he went back into his account. And then he would write her a check, but not always for the full amount? Well, that's not true, Your Honor. Okay. In what way? It's not true because that was stated in the brief without any citation to the record in support of that on the affidavit. There's no citation establishing that fact, which means that he's arguing that. The fact that these checks went into his account, the delivery, as it was established, the gift is complete upon delivery. Now, if he didn't give a gift back there in 1999, and you want to consider each one of these checks a gift, then when they're delivered, that's a completion of a gift for the check. How the person receiving the check wants to go ahead and convert that into cash is up to them. But if you had, like the bar code in the court wants it to be, that you don't have a gift complete until it's endorsed, then, of course, Rothwell, which says that you can go ahead and give a gift, other than, of course, a negotiable instrument is no good, and neither is the Uniform Commercial Code. I understand that, but this is really kind of muddied by that further conduct of it going back to him and him putting in his account. I mean, it does give credence to the argument that maybe it was a convenience factor to go to her address, something along that line. Well, there's nothing in there on that, Your Honor. The fact is he had to go ahead and make an affirmative act. Now, this isn't just some default act. He had to make an affirmative act and dedicate in writing, start receiving to my mother. Now, she didn't quit based upon what he said he was going to give her. She quit her job once she started receiving those, being sent directly to her. Now, the law is, once you get that, no matter how difficult it is to convert it into cash or stuff, that doesn't affect your title or equitable interest in the property. So whether she went to him or went to somebody else and forced it against the issue of being under the UCC, it makes no difference how she got her cash. The point is, was it delivered to her? Did he intend her to keep it? Did he intend her to have these funds? And, of course, he did because he'd been doing it for 18 years. Now, if he didn't, then very easy, don't send it to her. So how about that? Another issue, a question I have is, you're talking of the contention here is over all the future checks? Yes, because we have a future interest that's being given. He says he's going to give it to her for life and quit your job and give this to you for your lifetime, live off the darn thing, then we'll take care of whatever checks won't come out when she's still living, which would be, number one, is a present gift of the future interest he referred to it. And we have argued the fact that the anti-Semite makes them keep a life interest, a life estate, into there. But the courts are pretty clear that you can still give a present gift of the future interest. How much money are we talking about? Well, the money payments are $3466, and sometimes in 2021, 2022, there's a lump sum payout of like $549. Don't keep me, but it's right around there. So that's what we're talking about on that. So basically, Your Honor, it's just the stuff that happened after the delivery is really not relevant to whether the gift was completed. Certainly, we've had allegations that, you know, like I said, the appellate briefed, but there's no citation to the record. The problem that we have that keeps coming up in this record that the appellate keeps talking, listen, 13 years has been going on since Barbara Coley even came onto the scene. Thirteen years, there's no problem with coming onto the scene. She's been getting it on. And as long as Barbara Coley comes on, then we start hearing all sorts of different stories. But it never was a problem before she came into the scene five years before her marriage. So we're just saying that there was nothing contesting the affidavits establishing the circumstances in which these settlements were interdicted. Nothing contesting the fact that he expressed his intent to give the settlement to her. And nothing contesting the fact that he told her, go ahead and quit your job because I'm going to give it to you so you don't have to worry about the rest of your life with financial support. So nothing contests that. And she quit her job. And she's been relying upon it. Did you hear that? Okay. And so, you know, that's the fact that we're facing. Now, what we have here is we have two checks in the lot. Time spent on the two checks that she had in her possession. Now, the issue about what's a prima facie case on the two checks. Well, the cases are pretty clear that a prima facie case is not just an unendorsed debt. If it was, then you could never have a gift if you had to endorse it. You can never transfer your right to enforce an unnegotiable instrument under the UCC. The one case that did address this was a North Dakota court. North Dakota came out and said, look it, why not go make an exception? What they considered casey is to be is an exception to the gift and transfer law for certificates of deposit. And that case that's not in the brief is COBAR. I would suggest if it's not in the brief, file a motion to supplement. Add supplemental authority and counsel will grant you leave to reply to that authority. So don't argue it here. I appreciate that, Your Honor. But anyway, if you look at the cases, cases that's cited in the prima facie case, it's only dealing with CDs. It relies upon two precedents on the first district. It relies upon the Holaback case. That dealt with whether or not an unendorsed stock certificate could be transferred. But Holaback said under the Illinois Uniform Stock Transfer Act, it cannot be. It has to be signed. So it held under the Act. And then it says, well, the other side has to prove by clear and convincing evidence if there is no presumption. However, as we've argued, there is a presumption of a gift in this case. The second case that casey relied upon was not a transfer or a gift issue. It was a question of finding in an attached safety deposit box a certificate that was in the mother and daughter's name, but the box was in the mother, daughter, and husband. And the court said, it doesn't make a difference whose name that box is on. We take a look at what's in there, and that, with the name on it, that belongs to them. It wasn't under the gift and transfer analysis. It was merely a fact. If you find it on the street, find it on the ground, who does it belong to? Now, the cases that are relevant out of the first district are the case of Hill, which is a 1963 case. And that court said it's not enough to make a primary case a case by showing an unenforced stock certificate. The fact that it was unenforced and it was in possession of the widow is insufficient standproof to show ownership. The mere delivery of a certificate by the husband to the wife with the expression of a gift is enough, citing the district case of Estate v. Watson where the deceit of giving the passbook to someone with the oral expression was sufficient to complete the gift. And also, Vicker, a 1963 case, which said failure to endorse a stock certificate is but a factor to be weighed. Possession of the certificate also cooperates the gift. So it doesn't establish that people face a case. So in this case, we have a presumption. None of the cases have held that a case that didn't deal was a presumption case. In this case, we have a presumption because of the transfer between family members. The presumption comes out that it is a gift. Now, if you don't, you know, if you want to contest that gift and that's what happens on your presumption, the other side has to come and contest it to produce evidence. If you don't do that, then you go ahead and, you know, you lose. And they did not present any evidence to the contrary of that, Your Honor. So what we have is basically the contesting of an issue. And this is, I refer the court to the Henri Estate-Hankey case. In that case, when the presumption of the fifth district said one of the facts necessary to establish a presumption, those are going to belong to you. Then the burden of production of evidence shifts to the opponent. If the opponent produces no evidence, that's it. They lose. The presumption will carry. And there was no evidence. You saw what the charges were after this presumption. We insisted upon the presumption. And once you have a presumption, the Supreme Court is very clear, and it's a strict, strict degree of proof, that you have to come up with clear, convincing, unmistakable evidence that no gift was intended. And certainly, that hasn't been approved. Certainly, we can attempt to muddy the water, but it hasn't come up to show that no gift has been or was not intended. So under that, under those cases, Your Honor, then we certainly would say that they have not met their case. The other thing I would say, Your Honor, is that there's an issue about whether or not the administrator was a stop. We say the administrator was a stop from challenging because we think the decedent would be a stop from challenging. Once he told his mother they were going to do this, then the mother quits. You can't end it out and say, no, we're not going to do it. So after the decedent died 18 years later, they're attempting to take back what the decedent told the mother he was going to do, and she relied upon it to her detriment of quitting her job. So we think that that prevents the administrator from challenging. The court held that stopping doesn't apply because there's no gift.  The point is, there's been a statement, what's going to happen? And the estoppel comes in because you can't take that back once the person is active. So we've also got that part in there, Your Honor. The other thing that comes in is the court says, well, you know, we talk about the future interest, the settlements. When she quits working and she's given his future interest, the issue is, well, he really didn't need to give it. Well, you know, when you tell your mother to quit working, I'm going to give you financial support for the rest of your life. Don't worry about it. It's hard to say that he didn't really need to give it. Now, what did the will say with respect to that? See, the will was after the initial structured settlement. Yeah. He wanted it to say specifically that I have an asset, a good structured settlement, and I want both the parents and the in-laws. I want them to share equally in that as compensation for the wrongful death, which, you know, shows he thinks that he wants to take care of both of them. And that was his intent. So the new wife renounced the will. Yes, she did. And what impact does that have? Well, it is a gift. No impact. Because the gift doesn't go into the estate. If it is not a gift, then it goes into the estate. Yes. So that would match the cost. And that's why we're here, basically. Otherwise, we wouldn't be. It's that straightforward. Now, we do, and I had, you know, a little bit before the report with the UCC and the other items that I had set up in detail. No one was in favor of the UCC, but it does apply. And it does basically say, you know, it's interesting. I learned a lot by looking at this. It says that just because you're an owner doesn't mean you can enforce the unsecured or unnegotiated negotiable instrument. It has to be a person entitled to. And a person becomes entitled to when the owner puts their name on it, gives it to them voluntarily with the intent that they have a title over the proceeds. And, indeed, that's what happened in this case. He doesn't have to endorse them in the way they negotiate, but she became a person entitled to it by getting the rights of the decedent when it was transferred to her. Let's see what else I would have, Your Honor. I would say the other thing, Your Honor, is we have a problem. The problem is in this case in court. Your Honor brought it up just recently about what is stated in the appellee brief. The Rule 141 is pretty strict. It's strictly enforced. But, of course, if you don't follow that, then you forfeit your argument. Now, the appellee brief makes arguments without citation to authority on page 10. The presumption of a gift does not apply in this case because she just said it better apply. And then Shirley does not have the right or ability to cash settlement checks without decedent's endorsement. No citations. Shirley could not cash checks without decedent's endorsement. Each payment that decedent made to Shirley was a separate individual gift. The UCC is inapplicable. No citations to law. An anti-Semite made it legally impossible to give the gift to Shirley. And remember, it's the distinction between giving her his contractual right to receive versus maintaining a life estate in it and giving her the income from the property. And that's what he was doing. What he got, he gave to her. He didn't give her the rights to enforce it. Shirley had no control or ability to do anything with the settlement checks. No citations. Shirley had no authority or ability to negotiate. Had the administrator not taken the action, then none of the checks would have been cashed. And then the settlement checks to decedent mailed to Shirley required the decedent's signature prior to being cashed. He signed some of this without citing law. And we believe that he forfeited those arguments. The other thing is, he didn't let it pass. The fact is, decedent would deposit the checks in his account and write Shirley a personal check for a non-gift or non-lesson, like Your Honor brought up, but no citation to the record on that. Decedent retained control of the meaning of the checks at all times. No citations on the record. Decedent wouldn't deposit them into his account. And there are other items here that I would just say that we pointed out in our brief that aren't no citations, they're nothing, and under the Illinois Supreme Court Interpretation Rule 141, they're forfeited. Thank you, Your Honor. Any questions of counsel? Counsel? Counsel, good morning, Your Honors. Lucas Leifer for Barb Cooley. Before I forget, you asked a question, Your Honor, about what the will says and how the property would be distributed. And I wished I had looked at the statute one more time last night when I was preparing, but I didn't. But I think I'm correct when I say. So what happened was he had a will, and it was a fairly old will. In fact, in one of these sections of the will, he said the structured settlement, which is the portion of the structured settlement that we're fighting over right now, he wanted it distributed half between his parents and half between the parents of his deceased wife. As of today, I believe his mother surely is the only person living out of those four people. And then my client, Barb, who was Ken Cooley's spouse, renounced the will. Since Ken Cooley did not have any surviving children, and he had a spouse and a mother, correct me if I'm wrong, but I believe that half of the estate then goes to Barb Cooley and half the estate goes to Shirley Cooley. So what we're in fact getting is, by Barb renouncing the will, is what Shirley would have gotten pursuant to the will anyway, which is half. He wanted his mother and his father to have half, and he wanted the parents of his deceased wife to have half of the estate or half of this settlement anyway. So in effect, his wishes are being fulfilled by my client, Barb Cooley, renouncing the will and her getting half of the proceeds and Shirley getting half of the proceeds. So it's kind of like we're spinning our wheels here. What the will says is what she's going to get anyway. And what Shirley's trying to do in effect is saying that the settlement doesn't belong to the estate, that he gifted it to her and that takes it out of the estate. This case started with a citation hearing, and to touch on the issue of estoppel very quickly, I don't think it's a very valid argument. I was thinking that through, but, I mean, you're putting a legal spin on this and presuming maybe he consulted a lawyer. The lawyer may have told him since it's going to be gifted, it never will be part of the estate. So he may have arrived at what the plaintiff is proposing here when his conclusion may have been that it would never be part of the estate if the situation was as it is now with just the new wife being alive and the mother. If that were the case, yes, I do think you're correct in saying that, but there's no evidence that that's what he was thinking. Well, I mean, there is some evidence allegedly, but I'm just saying that what you're saying is not real clear either. I guess it was just kind of, if you think about it, it's going to happen. You know what I mean? That's what would happen anyway. But getting back to whether or not this belongs to the estate, I think it's clear it belongs to the estate. It has to belong to the estate. The bottom line is Shirley Coley was getting Ken Coley's mail. That's it. That's the only thing that she was getting. The Rockwell case specifically says that mere possession of these checks is not enough. Was there any evidence regarding what you just said, that she was getting other mail from him? She was getting the checks for being mailed to her house. That is the only evidence that they have, in my opinion, in their favor, is the checks were being mailed to her house. I can't answer yes or no, whether there's any other mail that belonged to Ken Coley that was going to her house. But then she was getting the proceeds of those checks. She was, but she wasn't getting it. But there was a procedure, I guess you could call it, that was happening between the time the checks arrived at her house and she actually got proceeds from her son. It's my understanding that Ken would cash the checks, deposit them in his account, and then would turn around and write her a check. And it's my understanding it wouldn't always be for the same amount. It would be for a lesser amount sometimes than what the actual settlement check was for. I think what's very important to understand in this case as well is the fact that June of 2016, he stopped giving her money. He stopped doing it. And that shows there was no donate of intent. He had control and dominion over these checks. When you say he stopped giving her money, he stopped endorsing them. They were still coming to her. They were still being mailed to her. And that was, I think, an allegation. Was it that during the period of time he was ill? I don't know if that's, I don't think that's the case. Did he die of illness versus a sudden event? In my understanding, it was a sudden event. Unfortunately, I think Mr. Cooley had a pretty, what I would consider, rough lifestyle from my understanding. But that's what ultimately, I think, probably killed him. But it was sudden. It wasn't like he was in the hospital for days or weeks or months prior to his death. And so I think that one thing that the trial court relied on, which I think they probably did so, was the fact that he stopped sending her checks, or I'm sorry, he stopped endorsing the checks. But he didn't go get the checks. Well, she only had two in her possession. Right. So he must have. Because there was only two in her possession in September of 17 when the citation proceeding went through. So you would have from June until December is when he passed away, there would have been more than two checks, or should have been more than two checks in her possession. And I think the fact, I think the argument that they make that, you know, these checks belonged to her and she could do whatever she wanted with them, well, then why didn't she? I would love to see her, I wouldn't say I would love, but I would have liked to see what a bank would have done if she would have went into there and said, these are my checks, cash this for me, without an endorsement from Ken Coley. It's not, it's impossible. It would never have happened. I mean, it's just, it's, you know, what good does it do to her to have a stack of checks belonging to Ken Coley? They belong to the estate. They were clearly in his name. They had to be endorsed by him. They were endorsed by him all along from when he started giving her money. And each individual check that he turned around and wrote her, that was a separate individual gift. That's not a gift of a future interest. So your take then on the Rothwell v. Taylor case is what? The Supreme Court case that the appellant cited. Well, I think the only thing that they haven't, as the Rothwell case says, is possession is not enough. There has to be more. And I think that's what the facts in this case show. But that case also said there's no legal requirement for endorsement. Well, I think I wouldn't necessarily disagree that just because there's no endorsement that that's it. I mean, but there's got to be a little bit more, you know, to it. Like in that case there wasn't any evidence of any procedure like there is in this case where he would go there, he would get the check, he would endorse it. He would deposit it in his own account. And after he married Barb Coley, my client, he would deposit it in a joint account with her name on it. So it's like they were both making a gift to Shirley at that point and an individual gift when they went and they wrote her a check each time, a separate gift each time. I think the fact that they say that the burden was on the administrator to prove that there was not a gift is wrong. I clearly distinguish the cases that were cited by the appellant McCormick. In the McCormick case, there was a specific deed in that case where the deed was transferred to the person who was claiming the gift. In Wilson, it was a joint account where the person who was claiming the gift was on the joint account. And in Sullivan, again, there was a deed where there was joint tenancy. So in those cases, it's clear, yes, between two family members, there was presumed to be a gift because it was between two family members. And you had these instruments where there was a deed, a joint account, and again, another deed in Sullivan, where that person who was claiming the gift was actually on the account or on the deed. That's not the case here. She wasn't a joint owner on the checks. Everything had to be endorsed by Kenneth Coley. So those cases, in my opinion, don't apply here. And that the administrator just had to show a prima facie that these checks belonged to the estate, which they do. It had Ken Coley's name on it, no one else's name, just like the case I cited, the Casey case, where a CD had the decedent's name on it. That was enough. That's a prima facie showing that that instrument belongs to the estate. And then the burden falls upon the person who's claiming the gift that it belongs to them, that there has to be donated intent. That's what they have to prove. There are several factors to be considered by the court when determining whether or not there's donated intent, specifically whether it could be revoked, who had control and dominion over these things. And it's clear in this case that Ken Coley maintained control and dominion over these checks. By the fact that he would go to the house, endorse them, and deposit them in his account. Why didn't he deposit them in her account directly? Why didn't he just endorse the check and she had a blank instrument? She could go do whatever she wanted with it at that time. But that's not what he did. She had an account, I take it. Was there any evidence of that? I'm sorry? Was there any evidence to whether or not she had a checking account? I don't know what her age was. I don't know what her banking practices were. I can't answer that. But, you know, I think it speaks a lot that he would deposit it in his own account before writing her a check. The other thing that I think that needs to be pointed out is, you know, she says that the estate is a stop from trying to collect these checks. Well, the evidence is that she didn't get any more checks beginning June of 2016. Why didn't she file a stopple claim? She could have filed a stopple claim against her son who was living at that time. Where are my checks? You are a stop from taking these checks away from me because you promised me that I can quit my job and you're going to give me these checks. So her stopple claim should have came back in June of 2016 when she stopped receiving the checks. So I don't think that that's a valid argument in this case. I don't think a stop applies in this case because there isn't really very much good evidence and valid evidence. Shirley Coley says this is what happened. And Shirley Coley is, of course, going to say that. That's because it's going to benefit her. So I don't think there's any unbiased evidence that this is what was his intent. Barb, I don't know, had a very good relationship with Shirley. So I think there's a little bit of animosity there. But regardless of, I think the court has to look and first determine which standard to apply. Who has the burden of proof in a citation hearing? And I think it's clear that the administrator made a prima facie case and then the burden was on Shirley Coley, which she did not meet. Everything goes against these factors. The other thing is they raised an issue about the fact that the court did consider that she stopped receiving checks back in June of 2016. And they claimed that that was improper. That was not improper. And that wasn't the only thing the court considered. If you look at the order the court issued, it was that coupled with several other things, like the fact that Ken would go to her house and endorse the checks and then cash them and then write her a check. Furthermore, the settlement documents and the trust documents clearly say that this is not assignable and it belongs to the estate. If he passes away before all the payments are made, it goes to the estate. That's undisputed. That's what the trust document says. Simple contract, well, the plain and ordinary meaning of the terms of the contract. The trust was a contract. And it says the settlement belongs to the estate if something happens to Ken Coley before all the payments are made. There's no evidence in this case to dispute or to go around or to take any evidence outside the four corners of the contract that say this belongs to the estate. The checks were in the name of the estate. The checks were in the name of Ken Coley. The trust says it belongs to the estate if something happens to Ken Coley. The other question that they brought up in their brief was the fact that the administrator didn't have the authority to go after these checks. First, I'd like to say that they didn't object at the citation hearing to the administrator or file a motion to dismiss or to strike the citation. So I think that argument on their part is waived at this point. But if the court considers it, the administrator certainly has the authority. In fact, they have the fiduciary duty to go after assets like this to try to collect them for the estate. There was certainly a good faith and reasonable belief on behalf of the administrator that these checks belong to the estate. They were named in the name of Kenneth Coley alone, and the trust documents that the administrator had said that they belong to the estate. I mean, I don't know what else the administrator could or should have done. In fact, if he wouldn't have pursued these checks, I think he would have been breaching his fiduciary duty to the estate by not trying to collect them. Just, you know, as the court is well aware, this is a manifest way of the evidence determination, and I do not believe that the trial court made a decision that was improper and that was against the manifest way of the evidence. When you look at everything as a whole, and that's the thing, you have to take everything here as a whole and the procedure from when the unfortunate events that led to Mr. Coley getting this settlement, along with how he gave his mother the money. He did not just give her a blank endorsed check. He went and picked up the checks, went to the bank, cashed them, and then wrote her checks. Furthermore, he stopped doing it in June of 2016, months before he passed away. I think that once you look at that and you look at the donative intent, it doesn't exist, and I think that you have to uphold the trial court's ruling that these checks do belong to the estate. So I'd ask the court to uphold the trial court's ruling, and thank you. Thank you, counsel. Counsel? The issue of public wishes, decedent's wishes, decedent at the time that 1992 when there wasn't any hope of that kind, that there would be compensation or enough funds in a pot to compensate both sets of parents. One of them to split what he got. After that, two years later, it changed because the Trumbulls were able to get their negotiated settlement. His wishes were that both the parents would share equally. That's what the rule shows, the compensation. The Trumbulls got their settlement, which was comparable to what the settlement was with the doctor. So there's nothing in evidence there, but common sense could be if you're looking at the situation and you're saying, well, the Trumbulls got theirs, haven't given anything to my mother, she should get hers, too. And that's what he did. He did that, and he told her that he was giving it to her. So it doesn't fulfill his wishes that she not have this. It fulfills his wishes because now she has a comparable settlement to what the Trumbulls had, which she wanted all along. The second thing, we keep going back to all this activity, what he did and did not do afterwards. If we stop and say the gift was complete, then all of that's irrelevant. If the gift is complete of the undivorced detriment, there it is. If he wanted to stop giving her, all he had to do was tell the trust board he had in writing to send it to me, which he did not. I mean, we're talking about a deferral of act. This isn't a default where someone sends you mail and you're getting other people's mail. This is more usually an act. Well, that's when she stopped receiving the checks. Pardon me? Well, at some point she did stop. No. Excuse me, Your Honor. That gets confusing. When he's saying the checks, you have to understand, the decedent's checks versus the checks from the structure settlement. She always got those. She stated in the affidavit and even the trustee agreed. She's still getting these things. I'm going to file a citation against the bank giving it to her to stop sending it to her. She always got it. She never stopped getting those checks. That's what she had. So he's saying there's only one way to go through it, and that's through the decedent. That's not the case. There's a law assigned to it. It's not supported by what the law is, and that's wrong. Because, quite frankly, you couldn't have a gift if you had a way for someone to endorse it. It wouldn't be. So you could not have a gift in common law. And, quite frankly, in the UCC, you couldn't transfer your rights to someone else to enforce a contract without doing it by negotiation or endorsement. That's not what the UCC says. So in both statutory and common law, his endorsement was not necessary for her to cash it. And the fact that she thought so, that the layperson, well, gee, I've got to get me an endorsement, doesn't make it the law. The law establishes what her rights are. And so there was no agreement that she made with the decedent that I would do that. There was no proof of that agreement. It was just a process she thought that she had to use to do it. But under the law, that's not correct because that was hers to do with whatever she wanted, make whatever arrangements she wanted to enforce the checks. And, like I said, it's a very simple thing, not to get all confused. Well, if he didn't want her to do it, and if he didn't give it to her 18 years ago, and after 17 and a half years, each one of these are monthly to monthly, stop sending the checks. But he didn't. And she continued to get them. And she continued to ride home to live. And, you know, in the other case, Your Honor, where they talk about, where it's brought up again about the lesser amounts and all this, you know, even if she did, although he cites the nothing in the record, but even if she did work out an arrangement and say, fine, either, Your Honor, you can take 66 bucks off, hey, you can come up here and get these things done for me, whatever that is, that doesn't eliminate the intent of giving her those checks and having the funds available. 66 bucks out of 3,400, you know, what the heck? And we don't know how long that was going on. There's nothing here in putting it into context. And that's an argument made without citing to the record that we can't really address other than to avoid the confusion. So, quite frankly, we have the person telling her that she's going to do this. Quite frankly, when he says she's not, they're not astounded. When she puts her work, that affects her retirement. It affects everything. She's relying on him for 18 years. And all of a sudden they say, no, no, no. Whatever he said, whatever you have seen said, whatever he tried to give you, no, that doesn't work because of the technicality here. Because we're saying, well, no, this wasn't done. Well, who did he say it was? Thank you, counsel. We appreciate the briefs and arguments of counsel. We will take this case under advisement issue, a ruling in due course. Thank you.